[Cite as *CHS-Lake Erie, Inc. v. Ohio Dept. of Medicaid*, 2020-Ohio-505.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| CHS-Lake Erie, Inc. et al., | : | |
| Appellants-Appellees/ Cross-Appellants, | : | No. 18AP-897 |
| | : | (C.P.C. No. 16CV-9766) |
| v. | : | (REGULAR CALENDAR) |
| Ohio Department of Medicaid, | : | |
| Appellee-Appellant/ Cross-Appellee. | : | |
| | : | |

D E C I S I O N

Rendered on February 13, 2020

**On brief:** *Webster & Associates, Co., LPA*, and *Geoffrey E. Webster*, for appellees/cross-appellants. **Argued:** *Geoffrey E. Webster.*

**On brief:** *Dave Yost*, Attorney General, and *Rebecca L. Thomas*, for appellant/cross-appellee. **Argued:** *Rebecca L. Thomas.*

APPEAL from the Franklin County Court of Common Pleas

BEATTY BLUNT, J.

{¶ 1} Appellant/cross-appellee, the Ohio Department of Medicaid (the "department")[1] appeals from a judgment of the Franklin County Court of Common Pleas affirming in part and reversing in part the department's adjudication order determining

---

[1] Pursuant to 2013 Am.Sub.H.B. No. 59, the General Assembly created the Ohio Department of Medicaid effective July 1, 2013. The Ohio Department of Medicaid assumed responsibility and authority over the Ohio Medicaid cases previously under jurisdiction of the Ohio Department of Job and Family Services. References to the "department" throughout this decision refer either to the Ohio Department of Job and Family Services or the Ohio Department of Medicaid interchangeably depending on the relevant time frame.

that appellees/cross-appellants, CHS-Glenwell, Inc. (dba Glen Meadows), CHS-Glenwell, Inc. (dba Wellington Manor), CHS-Greater Cincinnati, Inc. (dba East Galbraith Health Care Center ("East Galbraith")), CHS-Lake Erie, Inc. (dba Carington Park), CHS-Miami Valley, Inc. (dba Vandalia Park), CHS-Miami Valley, Inc. (dba Franklin Ridge), and CHS-Ohio Valley, Inc. (dba Terrace View Gardens) (collectively, "CHS"[2] or "the facilities") owed the department $11,111,557.96 in Medicaid provider overpayments. For the reasons which follow, we affirm in part and reverse in part the judgment of the common pleas court.

## I. Facts and Procedural History

{¶ 2}   CHS operates long-term care facilities, providing room, board, and nursing services to persons eligible for benefits under Ohio's Medicaid program. Pursuant to R.C. Chapter 5111[3] and Title XIX of the Social Security Act, the department administers the Medicaid program in Ohio.

{¶ 3}   In 2009, the department issued proposed adjudication orders to CHS. The proposed adjudication orders informed CHS that the department intended to implement the findings of final fiscal audits, which demonstrated that CHS had received an overpayment of Medicaid funds. CHS timely requested R.C. Chapter 119 hearings on the proposed adjudication orders. The department consolidated the matter into a single proceeding and appointed a hearing examiner.

{¶ 4}   The department conducted two types of audits in this case: cost report audits and days audits. In the cost report audits, the department audited the calendar year[4] 2003 cost reports filed by Carington Park, Terrace View Gardens, Vandalia Park, and Franklin Ridge; the six-month cost report filed by East Galbraith covering July 1 to December 31, 2003; and the three-month cost reports filed by Glen Meadows and Wellington Manor covering December 1, 2003 to February 29, 2004.  The hearing examiner referred to all the cost reports as the 2003 cost reports.

---

[2] Although Carington Health Systems, the parent corporation to the facilities at issue, operates other long-term care facilities, references to CHS herein refer only to the seven named facilities.

[3] The Medicaid reimbursement statutes and rules have been revised since the time of the events at issue in this case. All references to R.C. Chapter 5111 and Ohio Administrative Code Chapter 5101 throughout this decision are to the versions of those statutes and rules in effect during the fiscal years for which the department sought repayment.

[4] A calendar year went from January 1 to December 31; for example, calendar year 2003 went from January 1 to December 31, 2003.

{¶ 5}   Nursing facilities report their yearly operating costs to the Medicaid program through cost reports.  Nursing facilities prepare cost reports using the accrual basis of accounting.  The 2003 cost reports contained separate cost centers for direct care costs, indirect care costs, capital costs, and other protected costs.

{¶ 6}   From fiscal year[5] 1994 to fiscal year 2005, Ohio used a nursing facility's calendar year cost report to establish the facility's per diem rate for the subsequent fiscal year.  For example, the calendar year 1994 cost report established the per diem rate for fiscal year 1996, and the calendar year 1995 cost report established the per diem rate for fiscal year 1997.  *Bryant Health Care Ctr. v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 13AP-263, 2014-Ohio-92, ¶ 6.  Thus, the facilities' calendar year 2003 cost reports established the facilities per diem rates for fiscal year 2005.  The per diem rate was the amount the facility received per resident per day.  *Id.* at ¶ 5.

{¶ 7}   In the days audits, the department reviewed the days the facilities were paid for rendering services to Medicaid recipients ("patient days") and reviewed the funds the facilities collected from their Medicaid recipients ("patient liability").  In reviewing the patient days, the department sought to determine whether the facilities actually provided each resident care for the number of days the facility claimed to have provided such care. *See Clifton Care Ctr. v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 12AP-709, 2013-Ohio-2742, ¶ 15; *Meadowbrook Care Ctr. v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 06AP-871, 2007-Ohio-6534, ¶ 14.  In reviewing the patient liability amounts, the department assessed whether CHS had collected the proper amount of contribution from each resident.  Medicaid recipients may be required to contribute to the cost of their care depending on their income, and the difference between "the individual's patient liability and the monthly medicaid cost of care is the medicaid vendor payment amount."  Ohio Adm.Code 5101:1-39-22.2(B).  The department audited the patient days and patient liability amounts for the following facilities during the following fiscal years: Carington Park, Terrace View Gardens, Vandalia Park, Franklin Ridge, and East Galbraith for 2003, 2004, 2005, and 2006; Glen Meadows for 2004, 2005, and 2006; and Wellington Manor for 2005 and 2006.

---

[5] A state fiscal year went from July 1 to June 30; for example, state fiscal year 2005 went from July 1, 2004 to June 30, 2005.

{¶ 8} The hearing before the department proceeded in two phases. Phase one concerned the threshold issue of whether the department, acting through the auditing firm Clifton Gunderson, had conducted qualifying audits of CHS's 2003 cost reports. The phase one hearings occurred on September 28, September 29, and October 5, 2009. The hearing examiner concluded the department had conducted audits of the 2003 cost reports.

{¶ 9} Phase two concerned the merits of the department's proposed audit adjustments under both the cost report audits and the days audits. The phase two hearings occurred on December 10 and 11, 2012, and January 22, January 23, January 24, April 8, April 9, April 10, and May 17, 2013. One of the issues addressed at the phase two hearings was the department's disallowance of certain consulting costs from the 2003 cost reports based on the liquidation of liabilities rule. Prior to the start of the phase two hearings, CHS filed a motion in limine seeking to block all evidence and testimony relating to the liquidation of liabilities rule. The hearing examiner denied CHS's motion.

{¶ 10} The consulting costs at issue concerned some of the facilities contracts with Strategic Nursing Systems, Inc. ("Strategic") and Providers Choice Administrative Services, Inc. ("Providers Choice"). The parties stipulated that Carington Park, Terrace View Gardens, Franklin Ridge, Vandalia Park, and East Galbraith contracted with Strategic for direct care consulting services in 2003. The parties stipulated that Carington Park, Terrace View Gardens, Franklin Ridge, Vandalia Park, and East Galbraith contracted with Providers Choice for indirect care consulting services in 2003. The noted facilities reported their costs from Strategic and Providers Choice on their 2003 cost reports. Although the parties did not enter into any stipulations regarding Glen Meadows and Wellington Manor, these facilities reported costs related to Strategic on their three-month cost reports.

{¶ 11} Carington Park, Terrace View Gardens, Franklin Ridge, and Vandalia Park entered into yearlong contracts with both Strategic and Providers Choice beginning on January 1, 2003. East Galbraith entered into six-month contracts with Strategic and Providers Choice beginning on July 1, 2003. The contracts with both Strategic and Providers Choice provided for annual services ("Annual Services") and stated that the fees for the Annual Services would be payable in monthly installments. The monthly invoices issued throughout 2003 pursuant to the Annual Services portions of the contracts stated

the invoices were "due upon receipt of invoice." (State's Ex. 58, 64, 93, 99, 120, 126, 155, 158, and 182.) The facilities paid the Annual Services monthly invoices by check.

{¶ 12} The contracts between Carington Park, Terrace View Gardens, Franklin Ridge, East Galbraith, and Strategic, as well as the contracts between Carington Park, Terrace View Gardens, Franklin Ridge, Vandalia Park, East Galbraith, and Providers Choice, also contained attachments providing for additional enhanced services ("Enhanced Services"). The attachments stated that the entire fee for the Enhanced Services would be invoiced to the facilities on December 31, 2003. The noted facilities issued promissory notes to Strategic and Providers Choice on December 31, 2003 as payment for the Enhanced Services fees.

{¶ 13} The December 31, 2003 promissory notes issued from the facilities to Strategic stated the unpaid principal and accrued interest would be payable in monthly installments beginning August 1, 2005. The December 31, 2003 promissory notes issued from the facilities to Providers Choice stated the unpaid principal and accrued interest would be payable in monthly installments beginning February 1, 2005. The facilities paid the promissory notes pursuant to their terms and, thus, did not make payments on the notes until 2005.

{¶ 14} Following its initial audit of CHS, Clifton Gunderson disallowed the Strategic and Providers Choice costs from the 2003 cost reports due to lack of documentation and a suspected related party issue.[6] After CHS produced documentation during discovery to support the Strategic and Providers Choice costs, the auditors identified the liquidation of liabilities issue. At the beginning of the phase two hearings, the parties stipulated that the department would proceed on the liquidation of liabilities issue as the proposed basis for disallowance of the consulting costs.

{¶ 15} Emily Hess, a senior manager at Clifton Gunderson who oversaw the CHS audit, explained there was a hierarchy of authorities the auditors used to determine what

---

[6] The auditors noted a suspected related party issue because the owners of CHS reported owning Strategic on their 2004 tax returns, and CHS failed to produce documentation to the auditors demonstrating that CHS did not own Strategic or Providers Choice in 2003. During discovery, CHS produced a purchase agreement demonstrating that the owners of CHS purchased Strategic on August 29, 2004 for $4.6 million. When CHS purchased Strategic, it owed Strategic $12 million. Thus, after the purchase CHS "owed the money to themselves. Strategic ha[d] a receivable of $12 million. The companies had a payable of $12 million. And when it was acquired, it became part of the combination, and they eliminated." (Tr. Vol. VII at 894.)

costs were allowable on the 2003 cost reports. The hierarchy, contained in Ohio Adm.Code 5101:3-3-01(A), consisted in order of authority of the Ohio Revised Code, the Ohio Administrative Code, Title 42 of the Code of Federal Regulations ("C.F.R.") Chapter IV, the Provider Reimbursement Manual[7] ("PRM"), and Generally Accepted Accounting Principles ("GAAP"). The liquidation of liabilities rule is contained in 42 C.F.R. 413.100 and PRM 2305. Because neither the Ohio Revised Code nor the Ohio Administrative Code address the timely liquidation of liabilities for cost reporting purposes, the auditors followed the hierarchy to apply 42 C.F.R. 413.100 and PRM 2305 to the 2003 cost reports.

{¶ 16} Hess explained that under the liquidation of liabilities rule, "[i]n order to be claimed on the cost reports" a short-term liability "must be expended or funds expended within a year of that cost report period." (Tr. Vol. II at 113.) Thus, for a short-term liability to be claimed on the 2003 cost report, the facility "would have to have those funds expended basically by the end of 2004 or 12/31/2004." (Tr. Vol. II at 111.) A short-term liability is a liability payable "within 12 months." (Tr. Vol. II at 113.) Because the Strategic and Providers Choice invoices were due upon receipt, Hess stated the invoices were all short-term liabilities.

{¶ 17} Hess noted that "most of the[] transactions" under the Annual Services portions of the contracts were allowable because the facilities paid the monthly invoices in either 2003 or 2004. However, Hess noted a few transactions under the Annual Services portions of the contracts which were not allowable because they were not paid until 2005. For example, Carington Park paid the November 30, 2003 Strategic Annual Services monthly invoice on March 28, 2005.

{¶ 18} Hess explained that PRM 2305 provided that if a short-term liability was paid by check or negotiable instrument, the instrument had "to be cashed and paid" and "funds transferred from one entity to the other" within "one year of the cost report period end date." (Tr. Vol. II at 114-15.) Accordingly, because the facilities did not transfer any funds to redeem the December 31, 2003 promissory notes until 2005, over one year after the end of the 2003 cost reporting period, Hess stated that the Enhanced Services costs were not allowable on the 2003 cost reports. Hess noted the payments made toward the promissory

---

[7] The Provider Reimbursement Manual is accessible at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021929.html.

notes in 2005 "would be allowed on the 2005 cost reports," and the payments made toward the notes in 2006 would be allowable on the "2006 cost report," and so on for the remaining years. (Tr. Vol. VI at 134.)

{¶ 19} CHS presented testimony from Bert Cummins, John Fleischer, and John Hapchuk to support its contention that the liquidation of liabilities rule did not apply to the 2003 cost reports. Cummins and Fleischer, both certified public accountants whose work focused on the long-term care industry in Ohio, stated they had never seen the department apply the liquidation of liabilities rule in an audit. Cummins asserted that the liquidation of liabilities rule could not apply to the 2003 cost reports because there was "no way that costs can be disallowed out of the 2003 cost report period and placed into a subsequent payment period." (Tr. Vol. II at 747-48.)

{¶ 20} Fleischer explained that because 42 C.F.R. 413.100 and PRM 2305 were Medicare rules, he was "not so sure" if the rules applied "for Medicaid." (Tr. Vol. II at 244.) However, Fleischer affirmed that the C.F.R. and the PRM were in the hierarchy of authorities applicable to Ohio Medicaid cost reports. Fleisher acknowledged the requirements of PRM 2305 but stated that in his opinion "if you were to take an ordinary expense and make it part of a long-term liability, I think at that point you're done. The liability has been liquidated within one year." (Tr. Vol. II at 240-41.)

{¶ 21} Fleischer also noted the liquidation of liabilities rule was "designed for an ongoing reimbursement system." (Tr. Vol. II at 301.) Because the General Assembly changed Ohio's Medicaid "reimbursement system legislatively" in 2004, "where they weren't going to use the cost report anymore," Fleischer asserted that the rules no longer "[made] sense." (Tr. Vol. II at 301.) Fleischer affirmed that the "rules made sense prior to the change in legislation." (Tr. Vol. II at 301.)

{¶ 22} Hapchuk worked at the federal level as an auditor for the Medicare and Medicaid programs in the United States Department of Health and Human Services, Office of the Inspector General. Hapchuk noted that, although the PRM was "a Medicare manual," because Ohio had "deemed it in part of its hierarchy of criteria, it applies to Medicaid too." (Tr. Vol. IV at 484, 486-87.)

{¶ 23} Hapchuk explained that 42 C.F.R. 413.100 applied to "health care providers not subject to prospective payment[]" systems. (Tr. Vol. IV at 509.) Hapchuk noted that in

the Medicare prospective payment system, "payment [was] not dependent upon what costs [providers] incur, it's dependent upon what type of services that they perform." (Tr. Vol. IV at 540.) Thus, Hapchuk stated the liquidation of liabilities rule did not apply in Ohio in 2003, because Ohio used "[a] prospective payment system" and had "moved away from the cost reimbursement to basically setting prices." (Tr. Vol. IV at 510.)

{¶ 24} The department called Julie Evers, the section chief for disability and aging policy at the department, to testify regarding the Ohio Medicaid reimbursement systems. Evers explained that Ohio used a "prospective cost-based system" of reimbursement from fiscal year 1994 to fiscal year 2005. (Tr. Vol. IV at 1009.) In the prospective cost-based system, the department used the costs reported in a facility's annual "cost report to establish a prospective rate for the subsequent fiscal year," but did not "go back and reconcile it to what the provider actually spent in that period." (Tr. Vol. IV at 1009-11.) Thus, in the prospective cost-based system each facility received a unique per diem rate "based upon their actual costs" reported on their cost report. (Tr. Vol. IV at 1029-30.)

{¶ 25} Beginning on July 1, 2004, Ohio began to transition to a price-based prospective system. Under the price-based prospective system, the department paid "similarly-situated homes the same price subject to a case mix adjustment." (Tr. Vol. IV at 1034.) Nursing facilities continue to file calendar year cost reports under the price-based system, but the department uses the cost reports to "look[] to the peer group experience" rather than to establish a unique per diem rate. (Tr. Vol. IV at 1034.) Evers explained that the hierarchy of authority contained in Ohio Adm.Code 5101:3-3-01(A) applied to the cost reports filed under both the prospective cost-based system and the price-based prospective system.

{¶ 26} On February 22, 2013, the department filed a motion in limine to preclude CHS from offering evidence concerning unpaid patient days and other unpaid claims for service. The hearing examiner granted the department's motion in limine on March 15, 2013.

{¶ 27} At the phase two hearings, the department submitted exhibits containing reports of examination setting forth the department's adjustments to the patient days and patient liability amounts. The department relied on the reports of examination as prima facie evidence to support its case in the days audits.

{¶ 28} On October 31, 2015, the hearing examiner issued a report and recommendation adopting the department's proposed adjustments under both the days audits and cost report audits. The hearing examiner concluded that the reports of examination depicting the department's adjustments to the patient days and patient liability amounts were prima facie evidence of those adjustments. As CHS failed to present evidence to "rebut [the department's] *prima facie* evidence with respect to patient days and patient liability adjustments," the hearing examiner concluded the department's adjustments in the days audits were correct. (Report & Recomm. at 12.)

{¶ 29} The hearing examiner observed that, although the C.F.R. and the PRM were regulations and interpretive guidelines "for Medicare cost reports," by including these materials in the hierarchy of authorities contained in Ohio.Adm Code 5101:3-3-01, "Ohio adopted these regulations to determine allowable costs for Medicaid cost reports in Ohio." (Report & Recomm. at 68.) Additionally, the hearing examiner noted that "[w]hether costs are allowable are determined by the law in effect at the time," such that "[a] future change in the reimbursement system [did] not provide justification to ignore the cost reporting laws in effect at the time of filing cost reports." (Report & Recomm. at 49.) As such, the hearing examiner concluded that the liquidation of liabilities rule contained in 42 C.F.R. 413.100 and PRM 2305 applied to the facilities' 2003 cost reports.

{¶ 30} As the "Strategic and Providers Choice Annual Services invoices and the Strategic and Providers Choice Enhanced Services invoices were due upon receipt," the hearing examiner held that the invoices were "short-term liabilities." (Report & Recomm. at 68.) Although most of the monthly invoices issued under the Annual Services portions of the contracts were liquidated within one year of the end of the 2003 cost reporting period, the hearing examiner noted several Annual Services invoices which were not allowable because they were not paid until 2005. The hearing examiner observed that "Terrace View Gardens, Franklin Ridge, Vandalia Park, Glen Meadows, and Wellington Manor paid the Strategic Annual Services December 2003 invoices by check dated March 2005," that "Carington Park paid the Strategic Annual Services November 2003 invoice by check dated March 2005 and the Strategic Annual Services December 2003 invoice by check dated April 2005," and that East Galbraith did not pay any of the 2003 Providers Choice Annual Services invoices until 2005. (Report & Recomm. at 64-65.)

{¶ 31} Regarding the promissory notes issued as payment for the Enhanced Services portions of the contracts, the hearing examiner observed that "none of the facilities' assets were transferred until 2005, over one year from the end of the 2003 cost report period." (Report & Recomm. at 23.)   As such, the hearing examiner concluded the Enhanced Services costs were not allowable on the 2003 cost reports.

{¶ 32} The hearing examiner recommended that the department adopt the proposed audit adjustments and order CHS to pay back to the department $11,111,557.96 in Medicaid provider overpayments.

{¶ 33} On October 3, 2016, the department issued an adjudication order adopting the hearing examiner's findings of fact, conclusions of law, and recommendations. CHS appealed the adjudication order to the common pleas court.

{¶ 34} On March 16, 2017, CHS filed a brief in the common pleas court. CHS asserted that the hearing examiner was unfairly biased in favor of the state, and that the department erred in applying the liquidation of liabilities rule to the consulting costs on the 2003 cost reports.  CHS further asserted that the department committed reversible error by refusing to hear evidence concerning the unpaid days and unpaid claims, and by preventing CHS from rebutting the department's prima facie case in the days audits.  The department filed a brief responding to CHS's arguments on May 9, 2017, and CHS filed a reply brief on May 30, 2017.

{¶ 35} On October 30, 2018, the common pleas court issued a decision and entry affirming in part and reversing in part the department's adjudication order. The court found no merit to CHS's contention that the hearing examiner was unfairly biased and "summarily reject[ed]" CHS's contention that it was "improperly foreclosed from seeking recovery for the 'unpaid days.' "  (Decision at 2.)  The court, however, agreed that the department erred in applying the liquidation of liabilities rule.  In discussing the liquidation of liabilities rule, the court noted only the promissory notes issued as payment for the Strategic Enhanced Services invoices; the court did not address Providers Choice or the Annual Services monthly invoices.

{¶ 36} The court observed that the department had followed the Ohio Adm.Code 5101:3-3-01(A) hierarchy of authorities "in applying Medicare's timely liquidation of liability rule set forth in 42 CFR 413.100 and §2305 of the Provider Reimbursement

Manual." (Decision at 6.) However, the court concluded the department had "ignor[ed] the competent and credible evidence demonstrating that Medicare would not have applied the rule to the transaction at issue." (Decision at 8.) Specifically, the court noted that Hapchuk's testimony, the Federal Register, and *Abington Mem. Hosp. v. Burwell*, 216 F.Supp.3d 110 (D.D.C.2016), demonstrated that the liquidation of liabilities rule did not apply in the Medicare prospective payment system. As Ohio in 2003 reimbursed Medicaid providers on a prospective basis, the court concluded that the "liquidation of liabilities rule was not applicable to the costs at issue in 2003." (Decision at 10.) The court also "adopt[ed] and incorporate[d] in full the reasoning set forth in [CHS's] Reply Brief at pages 17 to 28" in reaching its conclusion. (Decision at 10.)

## II. Assignments of Error

{¶ 37} The department assigns the following single assignment of error for our review on appeal:

> The lower court erred in concluding that the Department incorrectly construed and applied the liquidation-of-liabilities rule to disallow the consulting costs at issue.

{¶ 38} CHS cross-appeals, assigning the following four assignments of error for our review:

> [1.] Did [the department] deprive CHS of procedural due process by effectively failing to afford CHS a R.C. 119 hearing as required under federal and state law?
>
> [2.] Did [the department] improperly grant the motion in limine to exclude CHS from offering evidence on patient days when it offered several exhibits itself on patient days which the hearing officer mischaracterized as "prima facie evidence"?
>
> [3.] By cheating CHS out of patient days, did [the department] impermissibly shift costs to Medicare beneficiaries and other payers?
>
> [4.] By artificially lowering patient days for fiscal year 2003, is [the department] failing to observe fiscal responsibility given the resulting higher reimbursement rate to be applied to fiscal years 2004-2009?

## III. Standard of Review

{¶ 39} In an administrative appeal pursuant to R.C. 119.12, the common pleas court must consider the entire record to determine whether reliable, probative, and substantial evidence supports the agency's order and whether the order is in accordance with law. *Univ. of Cincinnati v. Conrad*, 63 Ohio St.2d 108, 110-11 (1980). Reliable, probative, and substantial evidence has been defined as follows:

> (1) "Reliable" evidence is dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true. (2) "Probative" evidence is evidence that tends to prove the issue in question; it must be relevant in determining the issue. (3) "Substantial" evidence is evidence with some weight; it must have importance and value.

*Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 571 (1992).

{¶ 40} The trial court's "review of the administrative record is neither a trial *de novo* nor an appeal on questions of law only, but a hybrid review in which the court 'must appraise all the evidence as to the credibility of the witnesses, the probative character of the evidence, and the weight thereof.' " *Lies v. Ohio Veterinary Med. Bd.*, 2 Ohio App.3d 204, 207 (1st Dist.1981), quoting *Andrews v. Bd. of Liquor Control*, 164 Ohio St. 275, 280 (1955). The trial court "must give due deference to the administrative resolution of evidentiary conflicts," although "the findings of the agency are by no means conclusive." *Conrad* at 111. The common pleas court conducts a de novo review of questions of law, exercising its independent judgment in determining whether the administrative order is " 'in accordance with law.' " *Ohio Historical Soc. v. State Emp. Relations Bd.*, 66 Ohio St.3d 466, 471 (1993), citing R.C. 119.12.

{¶ 41} An appellate court's review of an administrative decision is more limited than that of the common pleas court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993). The appellate court is to determine only whether the common pleas court abused its discretion. *Id.*; *Lorain City Bd. of Edn. v. State Emp. Relations Bd.*, 40 Ohio St.3d 257, 261 (1988). The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Absent an abuse of discretion, this court may not substitute its judgment for that of the administrative agency or the trial court. *Pons* at 621. However, on the question of whether the agency's order was in accordance with the

law, this court's review is plenary. *Kistler v. Conrad*, 10th Dist. No. 04AP-1095, 2006-Ohio-3308, ¶ 9.

**IV. Department's Appeal Proper Pursuant to R.C. 119.12(N)**

{¶ 42} Initially, we address whether the department has the statutory authority to bring the present appeal. R.C. 119.12(N) provides for appeals from a common pleas court's ruling on an agency's order. R.C. 119.12(N) states:

> The judgment of the court shall be final and conclusive unless reversed, vacated, or modified on appeal. These appeals may be taken either by the party or the agency * * *. An appeal by the agency shall be taken on questions of law relating to the constitutionality, construction, or interpretation of statutes and rules of the agency, and, in the appeal, the court may also review and determine the correctness of the judgment of the court of common pleas that the order of the agency is not supported by any reliable, probative, and substantial evidence in the entire record.

{¶ 43} Thus, R.C. 119.12(N) "allows an agency the right to appeal only on questions of law pertaining to state statutes as well as rules and regulations which were promulgated by the agency." *Miller v. Dept. of Indus. Relations*, 17 Ohio St.3d 226, 226-27 (1985). *See Katz v. Dept. of Liquor Control*, 166 Ohio St. 229, 232 (1957). "Once the appeal is perfected on these grounds, the appellate court has jurisdiction to review the lower court's ruling as to the particular question of law and whether it is supported by any reliable, probative and substantial evidence." *Miller* at 227. "The key is that the trial court actually rule on a question of law that pertains to the constitutionality, construction or interpretation of a statute or agency rule." *Enertech Elec. v. W. Geauga Bd. of Edn.*, 10th Dist. No. 96AP-370 (Sept. 3, 1996).

{¶ 44} The common pleas court acknowledged that Ohio Adm.Code 5101:3-3-01(A) made 42 C.F.R. 413.100 and PRM 2305 applicable to the 2003 cost reports. However, the court held that neither rule applied to the consulting costs at issue on CHS's 2003 cost reports. The court's ruling effectively interpreted Ohio Adm.Code 5101:3-3-01(A) to mean that there were exceptions to the application of the rules identified in Ohio Adm.Code

5101:3-3-01(A). As the common pleas court's ruling interpreted Ohio Adm.Code 5101:3-3-01(A), the department may appeal the court's ruling pursuant to R.C. 119.12(N). *See Enertech Elec.*; *Tiggs v. Ohio Dept. of Job & Family Servs.*, 8th Dist. No. 106022, 2018-Ohio-3164, ¶ 17.

## V. Department's Assignment of Error – The Liquidation of Liabilities Rule Applied to the 2003 Cost Reports

{¶ 45} The department's sole assignment of error asserts the common pleas court erred in concluding that the liquidation of liabilities rule did not apply to the consulting costs contained in CHS's 2003 cost reports.

{¶ 46} "Medicaid is a cooperative federal-state program through which the federal government provides financial assistance to states so that they may furnish medical care to needy individuals." *Drake Ctr. v. Dept. of Human Servs.*, 125 Ohio App.3d 678, 684 (10th Dist.1998), citing *Wilder v. Virginia Hosp. Assn.*, 496 U.S. 498 (1990), citing 42 U.S.C. 1396. States that choose to participate in Medicaid must comply with certain requirements imposed by the Medicaid Act and the regulations adopted by the Secretary of Health and Human Services ("Secretary"). *Id.*, citing *Wilder*. To qualify for federal assistance, a state is required to have an approved plan for medical assistance establishing a scheme for reimbursing participating health care providers. *Id.* at 685, citing *Wilder*.

{¶ 47} Thus, the administration of the Medicaid program "is left to the individual participating states according to a federally approved plan." *Morning View Care Ctr.-Fulton v. Ohio Dept. of Human Servs.*, 148 Ohio App.3d 518, 2002-Ohio-2878, ¶ 17 (10th Dist.). In contrast, Medicare is a "federal program that provides health insurance to the elderly and disabled." *Baptist Med. Ctr. v. Burwell*, U.S.D.C.D.C. No. 11-cv-0899 (Feb. 28, 2019). *See Sun Towers, Inc. v. Heckler*, 725 F.2d 315, 318 (5th Cir.1984), citing 42 U.S.C. 1395c; *Natl. Fedn. of Indep. Business v. Sebelius*, 567 U.S. 519, 630 (2012) (observing that "Congress elected to nationalize health coverage for seniors through Medicare," and that it "could similarly have established Medicaid as an exclusively federal program" but did not, opting instead to "g[ive] the States the opportunity to partner in the [Medicaid] program's administration and development").

{¶ 48} To participate in the Medicaid program in Ohio, each facility subject to a provider agreement must file a cost report covering the calendar year or portion of the calendar year during which the facility participated in the Medicaid program. R.C. 5111.26(A)(1)(a); Ohio Adm.Code 5101:3-3-20; *St. Francis Home, Inc. v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 06AP-287, 2006-Ohio-6147, ¶ 1. The costs included on a cost report must be "allowable," presented in accordance with "department rules," and must be "documented, reasonable, and related to patient care." R.C. 5111.27(B)(3); Ohio Adm.Code 5101:3-3-21(A)(2)(c).

{¶ 49} A cost is considered "reasonable" if it is "an actual cost that is appropriate and helpful to develop and maintain the operation of patient care facilities" and "does not exceed what a prudent buyer pays for a given item or services." Ohio Adm.Code 5101:3-3-01(AA). Ohio Adm.Code 5101:3-3-01(A) defines an allowable cost as "those costs incurred for certified beds in a facility as determined by [the department] to be reasonable." Ohio Adm.Code 5101:3-3-01(A) further provides:

> Unless otherwise enumerated in Chapter 5101:3-3 of the Administrative Code, allowable costs are also determined in accordance with the following reference material, as currently issued and updated, in the following priority:
>
> (1) Title 42 Code of Federal Regulations (C.F.R.) Chapter IV;
>
> (2) The provider reimbursement manual ("health care financing administration HCFA Publication 15-1,"); or
>
> (3) Generally accepted accounting principles.

{¶ 50} Title 42 of the C.F.R. is the public health title; Chapter IV deals with the Centers for Medicare and Medicaid Services ("CMS"). The United States Department of Health and Human Services administers the Medicaid and Medicare programs through CMS. *Bellevue Hosp. Ctr. v. Leavitt*, 443 F.3d 163, 168 (2d Cir.2006).

{¶ 51} 42 C.F.R. 413.100, titled "[s]pecial treatment of certain accrued costs," is contained in the subchapter of Chapter IV applicable to Medicare.[8] 42 C.F.R. 413.100

---

[8] In the portion of CHS's reply brief adopted by the trial court, CHS asserted that "presumably" only C.F.R. provisions "applicable to Medicaid" should apply to Ohio cost reports. (CHS's Trial Court Reply Brief at 17.) Ohio Adm.Code 5101:3-3-01(A) does not contain such a limitation, but rather cites generally to all of 42

recognizes that "under the accrual basis of accounting, revenue is reported in the period in which it is earned and expenses are reported in the period in which they are incurred." 42 C.F.R. 413.100(a). 42 C.F.R. 413.100 alters the accrual basis of accounting principles for costs related to short-term liabilities, vacation pay, and all-inclusive paid days off, sick pay, compensation of owners, non-paid workers, and FICA and other payroll taxes. For these costs, "Medicare does not recognize the accrual of costs unless the related liabilities are liquidated timely." 42 C.F.R. 413.100(c)(1). Regarding short-term liabilities, 42 C.F.R. 413.100 provides that "a short-term liability, including the current portion of a long-term liability (for example, mortgage interest payments due to be paid in the current year), must be liquidated within 1 year after the end of the cost reporting period in which the liability is incurred." 42 C.F.R. 413.100(c)(2)(i)(A). 42 C.F.R. 413.100, however, does not define what "liquidation" means in the context of the rule.

{¶ 52} The PRM "contains interpretive guidelines for implementing federal Medicare * * * regulations. The manual, originally issued by the Health Care Financing Administration, is maintained by its successor, the Centers for Medicare and Medicaid Services." *Bryant Health Care* at ¶ 42. *See also Abraham Lincoln Mem. Hosp. v. Sebelius*, 698 F.3d 536, 542 (7th Cir.2012); *Dept. of Health & Mental Hygiene v. Riverview Nursing Ctr., Inc.*, 104 Md.App. 593, 598 (1995), n.3 (noting the "PRM contains Medicare reimbursement guidelines * * * which elaborate upon the Medicare reimbursement regulations found in 42 C.F.R. Part 413"). PRM 2305, titled "Liquidation of Liabilities," mirrors 42 C.F.R. 413.100 and states that a "short term liability must be liquidated within 1 year after the end of the cost reporting period in which the liability is incurred." Section 2305 further provides:

> Liquidation must be made by check or other negotiable instrument, cash or legal transfer of assets such as stock, bonds, real property, etc. Where liquidation is made by check or other negotiable instrument, these forms of payment must be redeemed through an actual transfer of the provider's assets within the time limits specified in this section. Where the liability (1) is not liquidated within the 1-year time limit, or (2) does not qualify under the exceptions specified in §§ 2305.1 and 2305.2, the cost incurred for the related goods and services is

C.F.R. Chapter IV. Notably, none of the Medicaid specific C.F.R. provisions that CHS cited to in its trial court reply brief address cost reporting. In contrast, 42 C.F.R. 413.100 specifically addresses cost reporting.

> not allowable in the cost reporting period when the liability is incurred, but is allowable in the cost reporting period when the liquidation of the liability occurs.

{¶ 53} PRM 2305.1 provides that if, within the one-year time limit, the provider furnishes to its fiscal intermediary[9] sufficient written justification for non-payment of the liability, the intermediary may grant an extension for good cause not to extend beyond three years. Section 2305.2 states that the liquidation of liabilities rule does not apply to PRM sections 220, 704.5, 2146.2, or the PRM sections which require liquidation within 75 days after the end of the cost reporting period. Neither exception applies in the present case.

{¶ 54} CHS asserts that the liquidation of liabilities rule, as stated in 42 C.F.R. 413.100 and PRM 2305, should not apply to the present case because the rule "is _not_ an [Ohio Department of Medicaid] rule; it is a federal Medicare rule." (Emphasis sic.) (Appellee's Brief at 20.) Although 42 C.F.R. Chapter IV and the PRM are rules and interpretative guidelines applicable to Medicare cost reports, Ohio incorporated these rules into Ohio Adm.Code 5101:3-3-01(A) thereby making the liquidation of liabilities rule applicable to Ohio Medicaid cost reports.

{¶ 55} Notably, other jurisdictions routinely incorporate and apply federal Medicare guidelines to their state Medicaid programs. *See Heartland of Beckley WV, LLC v. Bureau for Med. Servs.*, Sup. Ct. of Appeals W.V. No. 15-0595 (Oct. 26, 2012) (noting the West Virginia Medicaid regulations provide that "federal Medicare statutes, regulations, and guidelines will be applied when federal and West Virginia Medicaid statutes, regulations, and guidelines are silent on a given point"); *In re McKerley Health Facilities*, 145 N.H. 164 (2000), quoting N.H. Admin. Rules, He-W 593.34 (providing that " '[d]ecisions governing the allowability of costs not specifically detailed' " under the New Hampshire Medicaid rules " 'shall be pursuant to the Medicare Provider Reimbursement Manual' "); *Redding Med. Ctr. v. Bonta*, 75 Cal.App.4th 478, 484 (1999) (providing that allowable costs under

---

[9] Fiscal intermediaries in Medicare handle the "[d]ay-to-day administration of the Medicare program." *Highland Dist. Hosp. v. Secretary of Health & Human Servs.*, 676 F.2d 230, 232 (1982). Fiscal intermediaries are "private nongovernmental entities," often times insurance companies, that "enter into contracts with Secretary, pursuant to the authority delegated by Congress in § 1395h, to serve as the Secretary's agent for various functions, including auditing provider cost reimbursement requests." *Id. Accord Regents of the Univ. of California v. Burwell*, 155 F.Supp.3d 31, 38 (D.C.C.2016) (noting that "fiscal intermediaries * * * act as the Secretary's agents"). Thus, a fiscal intermediary is simply an agent of the Secretary in the Medicare program.

the California Medicaid program are to "be determined based on the Medicare provisions of the Code of Federal Regulations and the PRM"); *Beverly Health & Rehab. Servs. v. Metcalf*, 24 Va.App. 584, 594-96 (1997) (same — Virginia); *Dept. of Health & Mental Hygiene* at 598 (same — Maryland); *Hampton Nursing Cntr. v. State Health & Human Serv. Finance Comm.*, 303 S.C. 143, 147 (1990) (same — South Carolina).

{¶ 56} The common pleas court concluded that the department ignored the evidence demonstrating that Medicare would not have applied the liquidation of liabilities rule to the consulting costs at issue. The record, however, demonstrates that the hearing examiner addressed and distinguished the evidence cited by the common pleas court.

{¶ 57} Hapchuk testified that the liquidation of liabilities rule could not apply to the 2003 cost reports because Ohio utilized a prospective payment system. However, Hapchuk admitted that he was not familiar with Ohio's cost reporting system and affirmed that he did not know what was allowable on an Ohio Medicaid cost report. Hapchuk testified that he did "not understand exactly what they, Ohio, did on its prospective payment system," noting that he had "not been given an opportunity to take a look at it." (Tr. Vol. IV at 516.) The "only thing" Hapchuk reviewed to gain an understanding of Ohio's Medicaid reimbursement system was a one-page document he printed off from the internet. (Tr. Vol. IV at 546.) The one-page document stated, without further definition, that Ohio's Medicaid reimbursement systems were "[r]etrospective 1980-91, Semi-prospective 1991-93, Prospective 1993-2002, Pricing 2003-present." (State's Ex. 274.) Based on this document, Hapchuk stated that Ohio's Medicaid reimbursement system was a "pricing [reimbursement system] from 2003." (Tr. Vol. IV at 636.)

{¶ 58} Hapchuk explained that the Medicare prospective payment system did not depend on the costs a provider incurred, but rather depended on the services the provider performed. Hapchuk noted that if Ohio had "continued on cost reimbursement" and not "mov[ed] over to a prospective payment system" he would have said "okay, probably this rule applies." (Tr. Vol. IV at 514-15.) Notably, when counsel for the department explained that Ohio's prospective cost-based payment system used a provider's actual costs to set rates, Hapchuk acknowledged that such a system was "not a pure prospective payment system as the Medicare system is." (Tr. Vol. IV at 531.)

{¶ 59} The Federal Register addresses 42 C.F.R. 413.100 and explains that:

> Generally, under the Medicare program, health care providers not subject to prospective payment are paid for the reasonable costs of the covered items and services they furnish to Medicare beneficiaries. [42 C.F.R. 413.100] pertains to all services furnished by providers other than inpatient hospital services * * * and certain inpatient routine services furnished by skilled nursing facilities choosing to be paid on a prospective payment basis * * *.

60 Fed.Reg. 33126, effective June 27, 1995.

{¶ 60} *Abington Mem. Hosp.*, which the trial court also cited, follows the Federal Register and notes that 42 C.F.R. 413.100 "was explicitly made inapplicable to inpatient care that was subject to the [Medicare prospective payment system] payment scheme." *Id.* at 122. However, *Abington Mem. Hosp.* further explained that the Medicare prospective payment system " 'relie[d] on prospectively fixed rates for each category of treatment rendered.' " *Id.* at 117, quoting *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C.Cir.1994). Thus, under the Medicare prospective payment system hospitals are "given advance notice of the pre-established rates at which inpatient services will be reimbursed," and hospitals are "reimbursed at those pre-set rates, irrespective of the costs the hospital actually incurs." *Id.* at 117. *Accord Atrium Med. Ctr. v. United States HHS*, 766 F.3d 560, 564 (6th Cir.2014); *Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155 (D.C.Cir.2015). *See Community Care, L.L.C. v. Leavitt*, 477 F.Supp.2d 751, 754 (E.D.La.2007), quoting *New GWO Report Examines Medicare PPS Effects on Nursing Homes*, 8 No. 1 Cal. Health L. Monitor 4 (2000) (explaining that the Balanced Budget Act of 1997 made the Medicare prospective payment system, which is based on " 'fixed, predetermined rates for each day of care,' " applicable to nursing facilities participating in the Medicare program).

{¶ 61} In contrast to the Medicare prospective payment system, Evers explained that Ohio's prospective cost-based system in 2003 used the actual costs reported on a facility's annual cost report to establish the facility's unique per diem rate for the subsequent fiscal year. Thus, while Ohio's reimbursement system was prospective, as it set a rate for a future period, it was also based on actual costs. *Accord Ohio Academy of Nursing Homes v. Ohio Dept. of Job & Family Servs.*, 114 Ohio St.3d 14, 2007-Ohio-2620, ¶ 2 (observing that "[u]nder a 'prospective payment' system that has been in place since

1993, Ohio reimburses a qualifying facility by paying it a per diem rate that is calculated based on the actual costs incurred by the facility in a prior period"); *Bryant Health Care Ctr.* at ¶ 5; *Arcadia Acres v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 06AP-738, 2007-Ohio-6853, ¶ 2.

{¶ 62} The hearing examiner addressed Hapchuk's testimony and concluded that "[s]ince in Ohio, in 2003, the rates were based upon the reported costs incurred, not the type of service performed, Ohio was not under a prospective payment system such as that described by Mr. Hapchuk and used by Medicare."  (Report & Recomm. at 31.) Furthermore, the hearing examiner addressed the reliability issues present in Hapchuk's testimony, noting that "Hapchuk admitted he was not familiar with the rules applicable to Ohio's Medicaid cost reports" and that Hapchuk's understanding of Ohio's payment system came from a "one-page document from the internet."  (Report & Recomm. at 30.)

{¶ 63} The hearing examiner also addressed the Federal Register's statement that 42 C.F.R. 413.100 did "not apply to Medicare providers under a prospective payment system." (Report & Recomm. at 43.)  Again, because "providers in Ohio were reimbursed based upon costs incurred rather than services provided," the hearing examiner concluded that Ohio's prospective cost-based system differed from the Medicare prospective payment system.  (Report & Recomm. at 43.)  Based on the differences between the Medicare and Ohio Medicaid payment systems, the hearing examiner concluded that CHS's "argument that 42 CFR 413.100 and PRM 2305 [did] not apply to [the] 2003 cost reports based upon the reimbursement system in effect at the time [was] not well-taken." (Report & Recomm. at 43.)

{¶ 64} Accordingly, the department addressed the evidence demonstrating that the liquidation of liabilities rule did not apply to the Medicare prospective payment system. The department concluded that the liquidation of liabilities rule could apply in Ohio's prospective cost-based payment system because the system was based on reasonable costs rather than set prices.  The common pleas court abused its discretion by holding that the department had ignored the evidence concerning Medicare's application of the liquidation of liabilities rule.

{¶ 65} Furthermore, "the General Assembly created administrative bodies to facilitate certain areas of the law by placing the administration of those areas before boards

or commissions composed of individuals who possess special expertise." *Parents Protecting Children v. Korleski*, 10th Dist. No. 09AP-48, 2009-Ohio-4549, ¶ 10, citing *Club 3000 v. Jones*, 10th Dist. No. 07AP-593, 2008-Ohio-5058, ¶ 29. Deference is afforded to an administrative agency's interpretation of its own rules and regulations if such an interpretation is consistent with statutory law and the plain language of the rule itself. *OPUS III-VII Corp. v. Ohio State Bd. of Pharmacy*, 109 Ohio App.3d 102, 113 (10th Dist.1996). *Accord Frisch's Restaurants, Inc. v. Ryan*, 121 Ohio St.3d 18, 2009-Ohio-2, ¶ 16; *Sierra Club v. Koncelik*, 10th Dist. No. 12AP-288, 2013-Ohio-2739, ¶ 24.

{¶ 66} We find that the department's conclusion that 42 C.F.R. 413.100 and PRM 2305 applied to the 2003 cost reports was entirely in keeping with and required by the plain language of Ohio Adm.Code 5101:3-3-01(A). As such, the department's conclusion that the liquidation of liabilities rule applied to the 2003 cost reports is correct.

{¶ 67} As the invoices issued under both the Annual Services and Enhanced Services portions of the Strategic and Providers Choice contracts were due upon receipt, they were short-term liabilities.[10] Because the debts were short-term liabilities, Ohio Adm.Code 5101:3-3-01(A), 42 C.F.R. 413.100 and PRM 2305 required that the debts be liquidated within one year of the end of the 2003 cost reporting period for the costs to be allowable on the 2003 cost reports. As such, the costs associated with the Strategic and Providers Choice Annual Services monthly invoices which were issued in 2003, but not paid until 2005, were not allowable on the 2003 cost reports.

{¶ 68} The promissory notes the facilities issued to pay the Strategic and Providers Choice Enhanced Services invoices were negotiable instruments. As such, PRM 2305 provided that the notes had to be redeemed by an actual transfer of assets within one year of the end of the 2003 cost reporting period. *See Professional Rehab. Outpatient Servs. v. Health Care Fin. Admin.*, S.D.Tex. H-00-2526 (Dec. 6, 2001) (applying the liquidation of liabilities rule and concluding that, because a promissory note issued in 1995 was payable by "December 31, 1998 — three years following the end of the 1995 cost reporting period" the promissory note "did not meet this liquidation requirement"); *Med. Rehab. Servs., P.C. v. Bowen*, E.D. Mich. 87-CV-74547-DT (Sept. 6, 1989) (observing that pursuant to PRM

---

[10] Notably, in CHS's December 5, 2012 motion in limine, CHS acknowledged that the promissory notes were "used to satisfy the short term liabilities." (Dec. 5, 2012 Mot. in Limine at 8.)

2305, "the issuance of [the] promissory note [was] not evidence of liquidation, unless plaintiff's assets were actually transferred to its creditor within one year of accrual").

{¶ 69} In the portion of CHS's reply brief adopted by the common pleas court, CHS asserted that the "promissory notes at issue were long-term liabilities, not subject to a Liquidation of Liabilities Rule." (CHS Trial Court Reply Brief at 20.) However, the promissory notes were issued as payment for the Enhanced Services invoices, which were short-term liabilities. The long-term nature of the promissory notes did not alter the fact that they were issued to pay short-term liabilities.

{¶ 70} While the presentation of a promissory note is sufficient to liquidate a debt for purposes of GAAP, the Medicare regulations which Ohio adopted in Ohio Adm.Code 5101:3-3-01(A) place additional requirements on this method of liquidation for cost reporting purposes. The Federal Register explains that while GAAP is "used to present the financial position of an organization," Medicare payment policy differs from GAAP as it seeks to "prevent the outlay of Federal trust funds before they are needed to pay the costs of providers' actual expenditures." 60 Fed.Reg. at 33129. Because a negotiable instrument does not cause an immediate transfer of assets, the Medicare regulations place additional requirements on negotiable instruments for cost reporting purposes.[11] Otherwise, providers could issue promissory notes and receive Medicare trust funds before ever expending their own assets.

{¶ 71} The requirements imposed by PRM 2305 applied to the promissory notes issued by the facilities to pay the Strategic and Providers Choice Enhanced Services invoices. Because the facilities did not transfer any assets as payments toward the promissory notes until 2005, beyond one year after the end of the 2003 cost reporting period, the costs associated with the Strategic and Providers Choice Enhanced Services invoices were not allowable on the facilities' 2003 cost reports.

{¶ 72} In the final analysis, Ohio Adm.Code 5101:3-3-01(A) plainly identifies 42 C.F.R. Chapter IV and the PRM as the reference materials to be used to determine whether costs reported on an Ohio Medicaid cost report are allowable. Those reference materials, at 42 C.F.R. 413.100 and PRM 2305, contain the liquidation of liabilities rule. The common

---

[11] Although the promissory notes at issue were negotiable instruments under R.C. 1303.03(A) (Uniform Commercial Code 3-104), the present case is concerned with the specific Ohio Medicaid cost reporting rules rather than general rules concerning negotiable instruments.

pleas court ruled that the liquidation of liabilities rule did not apply to the facilities' 2003 cost reports because the rule would not apply in the Medicare prospective payment system. The department, however, distinguished the Medicare prospective payment system from the Ohio prospective cost-based system, and concluded that the liquidation of liabilities rule could apply in Ohio's prospective cost-based payment system. The common pleas court erred in reversing the portion of the department's adjudication order applying the liquidation of liabilities rule to the 2003 cost reports.

{¶ 73} Based on the foregoing, the department's sole assignment of error is sustained.

## VI.      First & Second Assignments of Error on Cross-Appeal – CHS Not Entitled to Introduce Evidence of Unpaid Days and Reports of Examination Were Prima Facie Evidence

{¶ 74} CHS's first assignment of error asserts the department deprived CHS of a R.C. Chapter 119 hearing. CHS asserts it did not receive a R.C. Chapter 119 hearing "on patient days since the Hearing Officer granted the Department's motion in limine" to exclude CHS's evidence of unpaid days and unpaid claims for service. (Cross-appellant's Brief at 21.) CHS's second assignment of error asserts that the hearing examiner erred in granting the department's motion in limine and in characterizing the department's exhibits as prima facie evidence. As CHS's first and second assignments of error are related, we address them jointly.

{¶ 75} The hearing examiner had the authority to admit or exclude evidence at the administrative hearing. Our review is limited to determining whether the common pleas court abused its discretion by failing to reverse the hearing examiner's evidentiary ruling. *HCMC, Inc. v. Ohio Dept. of Job & Family Servs.*, 179 Ohio App.3d 707, 2008-Ohio-6223, ¶ 57.

{¶ 76} In granting the department's motion to exclude the evidence of unpaid days and unpaid claims for service, the hearing examiner observed that R.C. 5111.06 authorized R.C. Chapter 119 hearings "for providers to challenge matters included in final fiscal audits, which examine payments made to providers." (Mar. 15, 2013 Journal Entry at 4.) As an audit examines payments made to providers, the hearing examiner concluded that

"adjudication of claims for unpaid days and unpaid claims [were] not at issue in this administrative hearing." (Mar. 15, 2013 Journal Entry at 4.)

{¶ 77} "[A]bsent specific statutory or constitutional authority, a party has no inherent right to appeal from an order of an administrative agency." *Springfield Fireworks, Inc. v. Ohio Dept. of Commerce*, 10th Dist. No. 03AP-330, 2003-Ohio-6940, ¶ 17. *Accord* Section 4, Article IV, Ohio Constitution. R.C. 5111.06(B) provides:

> The department shall do either of the following by issuing an order pursuant to an adjudication conducted in accordance with Chapter 119 of the Revised Code:
>
> (1) Enter into or refuse to enter into a provider agreement with a provider, or suspend, terminate, renew, or refuse to renew an existing provider agreement with a provider;
>
> (2) Take any action based upon a final fiscal audit of a provider.

{¶ 78} If a party is adversely affected by an order issued under R.C. 5111.06(B), the party may "appeal to the court of common pleas of Franklin county in accordance with section 119.12 of the Revised Code." R.C. 5111.06(C). Thus, a party has R.C. Chapter 119 appeal right from any action the department takes based on a final fiscal audit. *Clifton Care Ctr.* at ¶ 12. An "audit" is defined as "a formal postpayment examination * * * of a Medicaid provider's records and documentation to determine program compliance, the extent and validity of services paid for under the Medicaid program and to identify any inappropriate payments." Ohio Adm.Code 5101:3-1-27(B)(1). Thus, an audit reviews payment made to "determine the amount of overpayment." Ohio Adm.Code 5101:3-1-27(B)(1).

{¶ 79} Accordingly, as an audit reviews payments, unpaid days and unpaid claims for service are not reviewed by the department in an audit. *See Clifton Care Ctr.* at ¶ 17 (observing that "[s]ince [the department] never paid the claims at issue, it could not audit them"). Accordingly, CHS had no right under R.C. 5111.06 to address the unpaid days and unpaid claims at the R.C. Chapter 119 hearing on the final fiscal audits.[12]

---

[12] CHS asserts that it was entitled to present evidence on the unpaid days and unpaid claims because in *Ohio Academy of Nursing Homes, Inc. v. Ohio Dept. of Job & Fam. Servs.*, 149 Ohio App.3d 413, 2002-Ohio-4721 (10th Dist.), this court "ruled the department must adjudicate all issues at once in a final fiscal audit pursuant to R.C. 5111.06(B)." (Cross-appellant's Brief at 22.) In *Ohio Academy of Nursing Home,* the court held that for a R.C. Chapter 119 hearing to occur pursuant to R.C. 5111.06, " 'there must have been a final fiscal audit, which impliedly means that all issues for the reimbursement period have been adjudicated.' "

{¶ 80} CHS asserts that the R.C. Chapter 119 hearing was the only opportunity CHS had to address its claims relating to the unpaid days and unpaid claims. However, Ohio Adm.Code 5101:3-1-57(B) provides that "[o]ther administrative actions affecting the provider's Medicaid program status which are not subject to hearings under Chapter 119 of the Revised Code, may be reconsidered by the deputy director in the office where the contestation arose." Notably, "denied claims and claim adjustments which may be reconsidered" pursuant to Ohio Adm.Code 5101:3-1-57(B), are expressly identified as "[a]ctions that do not provide [R.C. Chapter 119] hearing rights." Ohio Adm.Code 5101:6-50-01(C)(9).

{¶ 81} Furthermore, "when an agency's decision is discretionary and, by statute, not subject to direct appeal, a writ of mandamus is the sole vehicle to challenge the decision." *Ohio Academy of Nursing Homes v. Ohio Dept. of Job & Family Servs.*, 114 Ohio St.3d 14, 2007-Ohio-2620, ¶ 23. *Accord State ex rel. Potts v. Comm. on Continuing Legal Edn.*, 93 Ohio St.3d 452, 457 (2001) (providing that "[m]andamus is the appropriate remedy where no right of appeal is provided to correct an abuse of discretion by a public body"); *Heartland Jockey Club, Ltd. v. Ohio State Racing Comm.*, 10th Dist. No. 98AP-1465 (Aug. 3, 1999). To the extent CHS contends that the department has yet to deny or otherwise act on its claims for payment, a writ of mandamus is the proper vehicle to compel an agency to act. *State ex rel. GMC v. Indus. Comm.*, 117 Ohio St.3d 480, 2008-Ohio-1593, ¶ 9, citing *State ex rel. Levin v. Schremp*, 73 Ohio St.3d 733, 735 (1995) (holding that "[a] mandamus action is thus appropriate where there is a legal basis to compel a public entity to perform its duties under the law"); *Morning View Care Ctr.-Fulton* at ¶ 16.

{¶ 82} CHS asserts that when the department "offered testimony on its four exhibits as to patient days" the department "waived the prima facie presumption" for those exhibits. (Cross-appellant's Brief at 29.) The department initially introduced the reports of examination detailing the department's adjustments to the patient days and patient liability amounts as exhibits at the January 22, 2013 hearing. The department noted that it was relying on the exhibits as its prima facie case in the days audits. At the April 8, 2013

---

*Id.* at ¶ 25, quoting trial court decision. The statement in *Ohio Academy of Nursing Homes* meant that all issues pertaining to the audit had to be adjudicated during the reimbursement period. The statement did not indicate that a facility could introduce any issue unrelated to the audit at a R.C. Chapter 119 hearing on a final fiscal audit.

hearing, the department introduced four exhibits to replace four of the exhibits previously introduced at the January 22, 2013 hearing. The four revised exhibits cleared some of the department's prior adjustments to patient days. The department submitted the replacement exhibits as prima facie evidence of its adjustments to the patient days.

{¶ 83} CHS objected that the revised exhibits were unauthenticated. As such, the department presented Kierstyn Canter, an audit manager at the department, to authenticate the exhibits. Canter stated the four exhibits were created under her supervision and were all kept in the ordinary course of the department's business. CHS asserts that Canter's testimony waived the prima facie presumption on the four exhibits.

{¶ 84} Ohio Adm. Code 5101:6-50-09(A)(4) provides that "[a]ny audit report, report of examination, exit conference report, or report of final settlement issued by [the department] and entered into evidence is to be considered *prima facie* evidence of what it asserts." "Prima facie evidence has been defined as that which is 'sufficient to support but not to compel a certain conclusion and does no more than furnish evidence to be considered and weighed but not necessarily accepted by the trier of the facts.' " *Meadowwood Nursing Facility v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 04AP-732, 2005-Ohio-1263, ¶ 14, quoting *Cleveland v. Keah*, 157 Ohio St. 331, 337 (1952).

{¶ 85} "The presentation of evidence on some audit findings [does] not deprive [the department] of all applicable presumptions" under Ohio Adm.Code 5101:6-50-09(A)(4). *Id.* at ¶ 13. "However, to the extent that the witness testifies with respect to discernible audit factors, then the presumption [in Ohio Adm.Code 5101:6-50-09(A)(4)] has no effect." *Id.* As Canter simply authenticated the exhibits and did not testify regarding any discernable audit factors, Canter's testimony did not invalidate the prima facie presumption on the four exhibits.

{¶ 86} CHS contends that "[b]y granting the motion in limine, the Department precluded CHS from offering evidence on patient days." (Cross-appellant's Brief at 4.) However, the hearing examiner's ruling on the motion in limine only prevented CHS from introducing evidence on unpaid days and unpaid claims. The hearing examiner's ruling did not prevent CHS from presenting evidence on the patient days at issue in the audit or from rebutting the department's prima facie evidence.

**{¶ 87}** The trial court did not abuse its discretion by failing to reverse the hearing examiner's evidentiary ruling on the unpaid days and unpaid claims or in upholding the department's adjustments in the days audits. CHS's first and second assignments of error on cross-appeal are overruled.

## VII. Third & Fourth Assignments of Error on Cross-Appeal — Not Raised in Common Pleas Court

**{¶ 88}** CHS's third assignment of error asserts the department impermissibly shifted costs to Medicare beneficiaries and to other payers. CHS's fourth assignment of error asserts the department failed to observe fiscal responsibility by failing to pay CHS for the unpaid patient days in fiscal year 2003.

**{¶ 89}** CHS did not raise either argument contained in its third or fourth assignments of error in the common pleas court. CHS's failure to raise these arguments in the common pleas court forfeits these issues for appellate purposes. *Edmands v. State Med. Bd.*, 10th Dist. No. 16AP-726, 2017-Ohio-8215, ¶ 14. *Accord Nunn v. Ohio Dept. of Ins.*, 10th Dist. No. 18AP-114, 2018-Ohio-4030, ¶ 11 (noting that "[i]t is well established that a party may not present new arguments for the first time on appeal"). As CHS has forfeited these arguments, we overrule CHS's third and fourth assignments of error on cross-appeal. *Parker's Tavern v. Ohio Dept. of Health*, 195 Ohio App.3d 22, 2011-Ohio-3598, ¶ 11 (10th Dist.).

## VIII. Conclusion

**{¶ 90}** Having sustained the department's sole assignment of error, CHS's four assignments of error on cross-appeal are overruled, we reverse in part and affirm in part the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed in part, reversed in part, case remanded.*

BRUNNER and NELSON JJ., concur.

_____